The Honorable, the Judges at the United States Court of Appeals for the Fourth Circuit. Oyez! Oyez! Oyez! All persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit, are admonished to draw nigh and give their attention, for the Court is now sitting. God save the United States and this Honorable Court. Thank you. You may be seated. Good morning, everyone, and welcome to the Fourth Circuit Court of Appeals. And Judge Harris and I particularly want to thank Judge Cullen for joining us today. And with this panel, we have one case, and we're ready to hear argument in that case, Finley v. Kraft Heinz. May it please the Court, Judge Thacker, Judge Harris, Judge Cullen. My name is Thad Geyer from Medford, Oregon. I'm a contract lawyer for the Government Accountability Project, which is a whistleblower advocacy organization. They have assigned me to represent Mr. Finley here. This case actually begins with Paul's Kraft v. Long Island Railroad Company. And that is because this is where Judge Cardozo, who later became Justice Cardozo. Excuse me. It doesn't seem like your timer is moving. Oh. That's me. We need it to move. Thank you. Okay, go ahead. Thank you. Thank you. Causation. That's where Justice – Judge Cardozo, who then went on to become Justice Cardozo, basically rewrote the law of torts. And he had enough power and influence to be able to do that and influence what has been called since then an institution. But the idea was he essentially said that at some point the courts have to set a legal standard of causation apart from what the factual standards of causation are. And that's what we're here for today because the Supreme Court basically said we disagree with Justice Cardozo. And we disagree with this very idea of showing intent, this idea of this presumed causation. And where is it you think the Supreme Court did that? Are you talking about Murray?   And where in Murray did the Supreme Court say all this? Well, it's throughout the decision. Okay. Yeah. And did that alter our Fourth Circuit precedent, Feldman? Let me see. I would say that it doesn't alter the precedent except to the extent that Feldman probably assumed the intent factor was there because Feldman drew so heavily on McDonnell Douglas and that's where all of that has to do with intent. Well, in Feldman we said that the contributing factor element is, quote, broad and forgiving. You probably like that, right? That's part of what I love about the case. Okay. And so how is that applicable to the facts here? It's the same applicability to the facts here. But there's a couple of distinctions here, very important distinctions. Number one, this is a Food Safety Modernization Act case. That means a lot to this panel because the panel, of course, is not allowed to overrule any other panel or to make any major, major modifications. So Feldman is not a Food Safety Modernization Act case, so it's kind of analogous, but you aren't bound. But it's a substantial factor causation case, right? I don't understand. Why would it make a difference? Is there something about this particular statute that is relevantly different from the statute in Feldman? No, no. No.  The statutes are the same. It's just that the understanding, the context in terms of the rule of law changed radically with the unanimous Supreme Court case in Murray v. UPS. I feel like I am just missing something I want you to explain to me. I thought the court in Murray held that you don't have to show retaliatory animus to make out a substantial factor causation case. But I didn't understand either the magistrate judge or the district court in this case or, indeed, your colleague on the other side, anyone to be talking about a requirement of animus. It was not spoke of openly. So the court didn't come to that point, but that was essentially the context of what the court did. No, it wasn't. I felt like the animus cases are where, like, you know, someone is being sexually harassed at work, and the boss says, you might be happier, and complains, and the boss says, well, you know what, I think you'd be happier somewhere else. And then the defense would be, I wasn't angry. I was just trying to do what was best for the employee. So there was no animus. There was causation, but not animus. But I just don't see how that applies at all to the facts in this case. Because I think it's important to be able to understand what contributing factor is. You have to get to the point where if intent is not required, then any kind of causation that assumes intent also is not required. And that gets you to causation, and that is the case that I cited for you with what happened with Murray v. UBS on remand. We're now awaiting whether or not the en banc is going to be granted or not. But it went back down to the same panel, and as the dissenting judge said, you have to take your lumps. You can't just blow the Supreme Court off and then essentially try to write intent in by saying that contributing factor is causation. That's a very big thing because if contributing factor requires causation, it almost necessarily involves intent because you can't think of what contributing factor is without intent. Yes, you can. It is literally the example I just gave you. You're being sexually harassed. You complain about it. Your boss, in an effort to help you, switches you to a different department. The complaint was obviously a contributing factor. He moved you because you complained. But the defense used to be before Murray, but no animus. I wasn't angry. I encouraged people to complain. That's what Murray's about. I don't understand the company in this case to be saying, yes, we fired him because of his complaints, but we really wished him the best. We weren't angry. It's not that kind of case. Well, I agree with that in that sense. And the example you just gave is Murano v. Department of Justice, which was cited by the Supreme Court in Murray v. UBS. And in the Murano case, if I could just briefly, because it's such an important case. In the Murano case, Mr. Murano had made complaints that the DEA office he was in up in Albany, New York, was just so mismanaged that something had to be done. And as a result of that, an investigation was conducted by a whole different set of decision makers, and those decision makers said he's absolutely right. It's a terrible office, and we're going to start doing some reassignments, and he was reassigned. And in that case, the Federal Circuit held that that is a contributing factor. So all that it takes is any contributing factor. Well, what do you want us to do with the intervening factor here? I mean, there are the complaints, the alleged protected activity, and then the firing. But in between that, there's all of his dishonesty, which is the reason that he was terminated, according to the company. Right. You just want us to ignore that intervening part? Yes, you have to ignore that intervening part. We have to just ignore that. So he could just repeatedly lie and shift his story, and they can't fire him. Absolutely, they can fire him. They can't. But that has no effect on contributing factor. Contributing factor is uninfluenced by what the employer's reasons are, the causes that they give. And so the way the statute is set up, and it's very important how it's structured, is once he shows any contributing factor whatsoever, the company could still get rid of him and say it's because you're a liar. But they have to prove that by clear and convincing evidence. Okay, right. And so if we find that there is clear and convincing evidence here that that's the reason they fired him, or the district court found that, then it does make a difference. Well, to the extent that you're willing to say that the district court made any kind of finding on clear and convincing evidence, which it most certainly did not, all the district judge did was adopt essentially a footnote or two from the magistrate. But there's no credible discussion for this Court to accept. But you can see that he changed his story several times. Yes, but not from dishonesty, from confusion. And that gets you to the Tolman v. Cotton case, the Supreme Court case in 2014. This is like an unsung hero of summary judgment, and it was one where the Supreme Court took that on in 2014 and said we're going to take this on just because the district court and the Fifth Circuit and other judges are out of control on this. They are defying these contexts, and in these contexts that they build, these big pictures, these ideas of what really happened there, they are violent. I don't think anybody should be couching judges as out of control. You may disagree with them, but I don't know why you need to say that. But go ahead. Well, then forgive me on that. Mr. Garza, let me ask you, insofar as we don't agree with you that Murray abrogated legitimate intervening of that, let's talk about you point out that there are myriad genuine issues of material fact, and the investigation itself was flawed from start to finish, and you make the argument that Bobby Clark should be a comparator. Kraft says no, he's not, because he's not accused of dishonesty. But if you look at the record, I think you have an argument that Bobby Clark is a comparator, and perhaps he was as dishonest insofar as Mr. Finley was dishonest as Mr. Finley. As I read the record, Bobby Clark, the day before he was supposed to fire Ms. Gaines, said I fired three out of four, I'll take care of firing Ms. Gaines when I get back to work. Ms. Gaines comes back to work ten days later. She shows up, and when Bobby Clark is interviewed, he immediately points the finger at Mr. Finley and says he was supposed to have fired her and walked her out. So there's a direct contradiction, and the company didn't do anything to get to the bottom of Bobby Clark and his role in this thing, when, as I read it, and like most favorable to you, he's probably more dishonest than Mr. Finley. That may very well be the case, and certainly that's my view of it. And as you kind of introduced it, this really falls under the rubric of what the investigation was like and what they were really looking at in this case. The difference, and we point this out, this is undisputed evidence, the difference is Bobby Clark is not a whistleblower. Mr. Finley is a whistleblower, and therefore we have that. I do want to get back to Tolman, but yes, Judge? No, go ahead. Okay, just on Tolman, and this has to do with whether or not this is dishonesty or confusion, or just trying to remember. What in Tolman happened is the district court and the Fifth Circuit had said that Mr. Tolman started screaming and threatening the cops, and he was loud, and the cops were afraid, and the cops said we were afraid. And what the Supreme Court said is a jury, however, could find that he's screaming and yelling because he's worried about his mother, and that just because someone is screaming and yelling and saying stop doing this and stands up at the same time when the cops tell him to sit there and say get off of my mother, the Supreme Court said that goes to a jury, and that's exactly what we have here is what happened with whether or not Mr. Finley was confused or lying, that goes to a jury. Wait. What goes to a jury is whether he was confused or lying, or is what goes to a jury whether his employer believed he was lying and not confused? Absolutely not. What the employer believed has nothing to do with this case, because it doesn't have anything to do with the contributing factor standard, and that is because this idea, this honest belief of the employer, this comes from the olden days. This is McDonnell Douglas stuff, having to do with causation and intent of the employer. And the idea was that when an employer simply had to articulate a reason for getting rid of the employee because the employee is trying to make this prima facie case, all they had to do was articulate a reason. And the reason was because he was terrible this way, this way, this way. And that is where the court said if you don't have more than that and you just want to say but he was a good employee, he never did these things, the court said that was not enough. It has nothing to do with this case. Additionally, I want to point out that Kraft Hines does not assert the honest belief doctrine, which is very fascinating. They make an argument, but they stop short of being able to do that. So that has nothing to do with the case in my opinion. I'll save a couple of minutes. All right. Thank you. Ms. Williams, go ahead. May it please the Court, Kaitlin Williams on behalf of Defendant Appley Kraft Hines Foods Company. Kraft Hines terminated Mr. Finley's employment solely because it found that he was dishonest in violation of company policy. That finding of dishonesty was based on Mr. Finley's internally inconsistent statements about his involvement in the discharge process of another employee named Yolanda Gaines. In the span of one day, March 24, 2020, Mr. Finley gave Kraft Hines conflicting versions about his own involvement in that process of discharging Ms. Gaines. Ms. Williams, how did Mr. Finley become the target of the investigation on March 24? I mean, it's undisputed that Mr. Clark was a direct supervisor. He testified in his deposition that it was solely his responsibility to terminate Ms. Gaines. Other employees testified that supervisors like Mr. Clark were supposed to do that. And Mr. Clark himself told Mr. Finley in the presence of another witness whose declaration is in the record that he, Mr. Clark, was responsible for doing that. And then when this lady shows back up at work, all of a sudden Mr. Clark is pointing the finger at Mr. Finley. So it seems to me Mr. Clark is most culpable for this fiasco, this employee getting back in the building, and yet he emerges completely unscathed in this. So why is that and why isn't he a proper comparator? In the light most favorable of the plaintiff, I think he is, there's a credible question as to whether he was completely forthcoming and honest with HR. Judge Cullen, thank you for that question. And I did want to address the concerns that you raised with Mr. Clark as a comparator. I would like to just respectfully add one piece of Mr. Clark's deposition testimony that would negate the notion that he said he was solely responsible. He did go on to say that the task would go to his boss, and I believe that the district court noted that additional testimony from Mr. Clark. And do you know where that is in the JA, the additional testimony that you're highlighting? I will have to find the JA site for you. We can find it. It is where he elaborates that in Mr. Clark's absence the task would go to his boss. In his absence. Okay, and was that the key, that Mr. Clark was absent when the fired employee returned? Indeed, Mr. Clark was absent on the day the fired employee was supposed to be walked out. That's March 12th. He then was on a period of vacation and was not there when she did start returning to the building. I couldn't figure that out from the record. How long was he on vacation? I believe it was certainly the following day, which would be Friday. And then I don't think it is clear in the record how many days the following week he was there. But I don't think it's a material dispute as to whether Mr. Clark and or Mr. Finley witnessed Miss Gaines continuing to come to work, because that was not the reason for Kraft Heinz's discharge of Mr. Finley. To answer your question as to how this all kicked off and got going into Mr. Finley's direction from the company's perspective, when it became known to Miss Perry, who's an HR representative, that Miss Gaines had entered the building incorrectly, she started her process of endeavoring to find out why. Through that process, it was identified that Mr. Finley and Mr. Clark had both signed Miss Gaines's termination form. There was a hashing out of what went on, and in that hashing out, Mr. Clark, unlike Mr. Finley, was consistent in what he told Miss Perry. And that is how the idea of following up with Mr. Finley distinguishes itself from the lack of follow-up with Mr. Clark. Because on that crucial day of March 24, 2020, from the perception of the Kraft Heinz decision-makers, Mr. Clark remained consistent, Mr. Finley did not. But he contradicted himself because we know from Jesse Tracy and Mr. Finley that Mr. Clark told them on March 12th that he would take care of this when he returned to work. But the question is not whether he didn't take care of it when he returned to work. The question is what did he say to Maya Perry, to answer your question, that put the light on Mr. Finley? And from there, the material facts are that Mr. Finley gave Kraft Heinz conflicting accounts of his involvement. So at that point, on March 24, 2020, the knowledge in Kraft Heinz's decision-maker's mind is that he's not telling a straight story. But he never said he walked her out, correct? He did tell Miss Perry initially on March 24, 2020, both that he walked her out and that he turned in her termination. He denies that, though. He denies that, and he denied it to Kraft Heinz later in that same day, which is why Kraft Heinz believed that he was being inconsistent. And so I would urge the Court to focus on the perception of the Kraft Heinz decision-makers on March 24, 2020. It was indeed Mr. Finley's conflicting accounts, I walked her out, no, I didn't walk her out, that led them to the conclusion that he was being dishonest. And that is a crucial distinction from the company's perspective from Mr. Clark, who was consistent that day with Miss Perry. So looking to the perception of those decision-makers, Mr. Clark was not a comparator. More to the point of the contributing factor question that Mr. Finley's counsel makes much ado about. There was no other factor besides Kraft Heinz's conclusion that Mr. Finley was dishonest that contributed to the termination of his employment. Feldman is on all fours here. The District Court properly applied the contributing factor standard by asking, did Mr. Finley's alleged protected activity contribute, i.e., tend to affect Kraft Heinz's decision to terminate his employment? Assuming arguendo that he engaged in protected activity under the FSMA, the Food Safety Modernization Act, the Court correctly found that he did not. And ultimately that's because Mr. Finley has brought to the table only his own speculation as to a connection between his alleged protected activity and his termination of employment. Let me ask about temporal proximity, because in the light most favorable of the plaintiff, he was engaging in protected activity, and I know you're not conceding that, as late as March 12th. And we know that because when he sat down in that recorded interview with Josh Harp, Josh Harp's trying to orient him, and he says, remember it was that day you had come to me complaining about the blast attendance. It doesn't get any closer than that in terms of temporal proximity. I've never seen a case where it's within days. Doesn't that cut against Kraft's position in terms of contributing factor? I mean, that's, in my mind, a determinative factor. It went on until March 12th. Judge, thank you for that question. Temporal proximity is a relevant question when you're looking at contributing factor, as is legitimate intervening event. On the temporal proximity piece, we dispute that Mr. Finley engaged in protected activity on March 12th, not only because of our FSMA-based arguments, but because simply having Josh Harp's reorientation of him and coming from his prior statement 12 days earlier that he needed a blast attendant, saying that you need a blast attendant, number one, is not protected activity. But number two, Mr. Finley did not raise that allegation of protected activity until his summary judgment opposition brief. So it is not properly before the district court as an argument as to a contributing factor into his termination. Counsel, am I remembering right? Is this the objection that Mr. Finley raised that the district court never passes on because the district court says it doesn't matter, the magistrate thought it was enough temporal proximity, even if the latest one was in February? I'm concerned that the district court never ruled on this, and if we think about intervening event not as an on-off switch, but as something that might weaken the inference from temporal proximity, then it actually really does matter how temporally proximate these two things were. Do you see what I'm saying? I believe so, and tell me if this answers your question. Absolutely temporal proximity is a factor. If we just, for argument's sake, assume that he engaged in protected activity under the FSMA on March 12th, the intervening event here on March 24th, 2020, I would argue, is not just weakening the inference of causation. It is dispelling it completely. And the reason I say that is in part because even Mr. Finley concedes that his trajectory at work changed as a result of the Miss Gaines investigation. After March 12th, but before March 24th, 2020, Mr. Harp, Mr. Finley's supervisor, gave him additional responsibility for a new department, and Mr. Finley was excited about that. That suggests to me that this isn't just a weakening. I suggest that to you, but the question is what might a jury infer from this series of events, right? A jury might suggest something other to a jury. It might suggest to a jury that they were really mad about this protected activity and they waited for the first decent opportunity to do something about it, which was when this whole Gaines thing came up, and then they were like, great, this is our moment. I hear you. I don't believe that a reasonable juror would infer that from the facts. And I say that because it is simply not reasonable to leap from a March 12th, very vague reference to Miss Perry about a blast attendant. Miss Perry did not make the decision to terminate Mr. Finley's employment. After that, a decision maker in Mr. Finley's termination, Mr. Harp, gives him additional responsibility. That does not suggest he's going anywhere. After that, the Gaines investigation kicks off solely because Miss Gaines showed up to work and Human Resources had deactivated her badge, leading to the questions and the hash out that we were discussing earlier, in which Mr. Finley made inconsistent statements. And I don't think the record permits a justifiable inference that if not for the Gaines investigation and Mr. Finley's contradictory statements during it, he would have been terminated on March 26th, 2020. There were other opportunities prior to that date, and Kraft Heinz, to your question of is this the first moment, no, it was not the first moment. This was a sequence of events that had nothing to do with anything other than Miss Gaines showing up to work and the subsequent events that followed. There's no evidence in the record that Kraft Heinz took advantage of the situation. You were about to say there were other opportunities where they, I guess, could have terminated him before they finally did. Yes. For example, Mr. Finley brings up his March 26th management reviews that were positive. Those post-date much of his alleged protective activity. So I would also say that when we are contrasting the evidence as to what Kraft Heinz put forth regarding the consistency of the decision-makers' testimony regarding their basis for termination, on the other side of the ledger we have quite a few concessions from Mr. Finley that do not hold a candle to the objective evidence of the consistent decision-makers. Can I just ask you a question that will help orient me a little bit? Yes. Are we talking here about whether Mr. Finley made his prima facie case? Because I thought the magistrate judge said you didn't even make a prima facie case here. Or are we talking about what happens if he did, and now it's the defendant's burden to show that he would have done the same thing? Yes. We're really talking about both in a sense because Kraft Heinz's evidence as to the reason for its termination of Mr. Finley bears both on the contributing factor element of his prima facie case, and it's the evidence that the district court relied on in finding that he had not satisfied that burden. It also bears upon Kraft Heinz's ability to show by clear and convincing evidence that it would have taken the same action with respect to Mr. Finley in the absence of the alleged protective activity. I found that overlap somewhat confusing in this case. And when the magistrate judge says at the prima facie step, and it's part of that analysis, look, there's a legitimate intervening event, and that severs causation. I thought that was overstating it quite a bit, that an intervening event might weaken the inferences you could draw from temporal proximity, but I don't think we've ever said it makes it impossible to show causation. And so I got a little nervous that there was some mixing of standards here. Thank you, Your Honor. I don't believe that the judge suggested that it was automatically severed just because the presence of a legitimate intervening. Well, that's what the magistrate judge said, but you think there was something else going on? I do think the magistrate and the district court relied on the consistent evidence from Kraft Heinz as to the reason to Mr. Finley's termination. So insofar as he inspected and interrogated the record, the record supported that the legitimate intervening event was the only reason for the termination. And by virtue of that, the contributing factor standard has not been met. I would say that this Court in Feldman and Berrick look at whether the legitimate intervening event rationale applies at that contributing factor stage of the case, and have in those cases found that at that stage, a legitimate intervening event can disrupt any inference. My point that I hopefully made is that the same evidence can support both the lack of a contributing factor as well as the ability to establish the clear and convincing affirmative defense. I don't think the district court mistook the burdens. I think they used the same evidence at both stages of the case. But the magistrate judge, he addressed the affirmative defense in a footnote and said essentially for the same reasons I find no contributing factor, I would find that you have established by clear and convincing evidence. The district court didn't engage on that issue at all. So don't we perhaps as a minimum have to remand it to have somebody address the affirmative defense, even if we agree with you? I don't think if you agree with me, you need to remand, because the record is fully developed and this court can decide on the record that the parties have presented, regardless of whether the district court gave it the analysis that your honors would. The district court just got the causation standard wrong, right? Didn't the district court say this is a McDonnell Douglas case? Thank you for bringing that up, because I do want to make a point of clarification on that. The magistrate judge absolutely correctly articulated the burden shifting that applies to the FSMA, relying on Feldman and that standard that your honor recited earlier. The district court adopted and incorporated in full the magistrate's report, including that burden shifting analysis. The district court also adopted the magistrate, and when I say district court, Judge Cain adopted the magistrate judge's finding that no reasonable juror could find a contributing factor. The district court, in reciting kind of an introductory remark as to the law that's applicable to burdens, did cite an FMLA case, Nichols. That does not articulate the standard, as well as Feldman, as well as Berrick, as well as Burton, the FSMA case in the Western District of Tennessee. And so I do think there's a point of clarification that can be made on the articulation. However, reading Judge Cain's opinion, there is no indication that he held Mr. Finley to a higher standard than is applicable under Feldman and the contributing factor analysis. In fact, he notes that neither party objected to the magistrate's articulation and application of the standard, and his opinion, the heart of it, just went on to address the objections that Mr. Finley had raised. And so there was no reason to go further into the burden shifting, because it wasn't something Mr. Finley had objected to. Do you have a question, Judge? I do. In terms, I think you said that most of, insofar as he engaged in protective activity, it occurred before his last performance evaluation. Is that what you said? I said much of it occurred before his February 6th of 2020 performance review. All right. Well, as I read the record, and this is Mr. Finley corroborated by two of his co-employees, I mean, he was making regular complaints that went as far as to taking a package of bacon up to the supervisor's office, opening up, and then essentially suggesting they needed to shut down the entire line. He was complaining at morning meetings about the lack of calibration on the X-ray machines and they're not being utilized properly. And that was occurring, based on my reading, in February into March, right, in terms of temporal proximity. Under a contributing factor standard, that's particularly powerful evidence that I think could persuade a jury, right? Don't those create genuine issues of material fact here that factor into that calculus, and ultimately a jury needs to weigh that? I disagree, Judge. And I say that, again, because of the timing of the legitimate intervening event being Miss Gaines' termination, compounded with the fact that the only record evidence as to why Mr. Finley was terminated is his dishonesty. That evidence is rooted in the record. It is rooted in the case law that contributing factor and legitimate intervening event occur at the same stage of the analysis. And by contrast, what Mr. Finley suggests is the connection between his alleged protected activity and the termination is sheer speculation. He concedes that two of the key decision makers, Mr. Harp and Miss Wilson, it was their opinion that he was dishonest. He couldn't disagree with that conclusion. He concedes that the third key decision maker, Miss Longerbeam, was unaware of his alleged protected activity. And under those facts, it's not enough to go to a jury on one side having an employee's speculation and on the other side having this consistent decision maker testimony. On that same point, the individuals who Mr. Finley raised with respect to him going to the office admitted, if you look at their full testimony, Miss Debrick is who I'm referring to, that she heard from those decision makers that Mr. Finley was terminated because of his dishonesty. Her rumors are inadmissible hearsay, and that is not enough to withstand summary judgment. So I guess when I think about this case and the substantial factor causation standard, it seems to me that a jury maybe could really think, even if the company thought he had been dishonest in some quickly cleared up minor way about what seems to be a fairly minor incident anyway, it still might have made a difference when they decided they were going to fire him for this, that they were already kind of sick of all the complaints. I mean, is there some reason why this seemed like such a big deal to the company? And do we know that they fired other people for this kind of dishonesty? I mean, I know that the company put in evidence that they had fired other employees for falsification and dishonesty. But I can't tell, maybe that was someone falsified a safety report versus when someone comes into the kitchen and says, who left their lunch here? It stinks. Somebody says it wasn't me. And then five minutes later, they're like, okay, you got me. It was me. I feel like this just seems so trivial. Why would someone get fired for this? I would disagree that it's trivial. And I would point you to the perception of Ms. Wilson particularly, as well as Ms. Longerbeam, who are seeking to apply Kraft Heinz's company policy, which prohibits dishonesty. And their conclusion that he was dishonest, again, Ms. Longerbeam having no knowledge of his protected activity, and they're behaving consistently with how they have done in the past. We're not aware of a similar, to answer your question, we're not aware of a similar sequence of events where you have, in the course of an investigation, an employee giving conflicting answers. But that is not trivial in the honestly held belief of Kraft Heinz's decision makers. And on that final point with my remaining time, I would just want to point out that Mr. Finley's parents- Well, how long was it that this employee had access to the building when she should not have? It was 13 days, no, excuse me, it was 11 days that she had access to the building. Well, that's part of what, at least I would think you would think, makes it not trivial, that someone who should not have had access to the building did have access to the building for 13 days, and he was sort of a part of that. Indeed, and the record shows that, I believe it was Ms. Perry who recommended that the security guard, who's not a Kraft Heinz employee, but nonetheless that that person be removed from her assignment because of her dishonesty in the situation in which Ms. Gaines was permitted to come into the plant improperly. I'm seeing my clock go up, so if I may continue. Well, your time is actually up, so you can make a- Oh, I'm sorry, I'm sorry. Yeah, it's confusing. Thank you for letting me answer that final question in that event, and thank you for your counsel. All right, thank you. All right. You have five minutes in rebuttal. I have five minutes?  Thank you so much. Whether or not it's a trivial point, what happens with Ms. Gaines, what we do know is that her direct supervisor, Bobby Clark, sees her there all those days after he comes back from vacation. He only takes a couple of days off vacation, vacation time, and comes back. Doesn't think a thing about it, doesn't report it to anybody. Their whole computer system doesn't even know that she's there. She's clocking in and clocking out. They have no system at all for that, and I think that when you look at that, you really wonder where the trouble is going to go on this. And maybe the security guard is not a comparator, but I say that she is a comparator, but they say, well, she's a contract employee because they buzzed her through. Anyway, here's the point. The biggest point that I could make is contributing factor is a bell once rung cannot be unrung. It cannot be unrung once it's rung. And so when you have Mr. It could be overwhelmed by clear and convincing evidence on the defense, but where you have on page 19 of the brief, as you referenced, Judge Golan, where Mr. Harp, the direct supervisor, says to this befuddled Mr. Finley, just struggling to try to remember what had happened. Mr. Harp says, do you remember? I know, but that day, do you remember going in and out of HR office a lot? They mentioned that. You're in there, but it was a little more frequent, and it was about the blast attendant. It was about the terms. It was about. And then Mr. Finley says, see, I forgot about there even being about the blast attendant. And then points out, I then came back and talked to you about it. This blast attendant, this is the main thing because this is the main way the public is protected from breaking their teeth or choking to death on these things that go out the door. The stakes are very high. So that's either a contributing factor or not. Once it's a contributing factor, that's the bell. It doesn't get unrung after that. I say it's the same thing with time proximity. Once you have this protected activity in a close proximity of time, that's enough to establish your prima facie case. That's the bell that is rung. You cannot ever undo that time proximity. You can simply put on your case by clear and convincing evidence that you would have gotten rid of him anyway. No volume of evidence of how bad he was, and that's why I said before, doesn't matter if he's the biggest liar in the world. No volume of evidence can undo the contributing factor. And that's how Congress decided to do it. And Congress said that once we do that, we basically go into a whole new system, essentially unknown to the at-will regime. We're basically in Europe now where the employer has to make it for cause, except it's Europe supercharged because you have to make it for cause, clear and convincing evidence. Why? Because Congress wants to know about when airplanes are unsafe, when food is unsafe, when nuclear power plants are representing danger, when there's going to be pipeline spills, et cetera. That's what Congress said. We are willing to rewrite the system of accountability in the workplace if that is going to get us what we need, which is information so that we can protect the public. Thank you very much. All right. Thank you for your arguments. We'll come down and greet counsel. Then we're going to go conference this case and reconstitute the panel and have a short recess.
judges: Stephanie D. Thacker, Pamela A. Harris, Thomas T. Cullen